UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION

| In re: | § | Chapter 11 |
|---|---|---|
| | § | |
| CCNG ENERGY PARTNERS, LP, | § | Case No. 15-70136 |
| CCNG ENERGY PARTNERS GP, LLC, | § | Case No. 15-70141 |
| MOSS BLUFF PROPERTY, LLC, | § | Case No. 15-70137 |
| TRINITY ENVIRONMENTAL | § | |
| CATARINA SWD, LLC, | § | Case No. 15-70138 |
| TRINITY ENVIRONMENTAL | § | |
| SERVICES, LLC, | § | Case No. 15-70139 |
| TRINITY ENVIRONMENTAL SWD, LLC, | § | Case No. 15-70135 |
| and TRINITY ENVIRONMENTAL | § | |
| TITAN TRUCKING, LLC, | § | Case No. 15-70140 |
| | § | |
| Debtors | § | Joint Administration Requested |

**DECLARATION OF DANIEL B. PORTER IN SUPPORT OF
THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Daniel Porter, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. "I am the President and CEO of the General Partner of CCNG Energy Partners, LP ("**CCNG**") and am familiar with the day-to-day operations, business, and financial affairs of Debtors, as debtors and debtors in possession. I am also CEO of each of the other Debtor entities.

2. I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of: (i) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on October 12, 2015 (the "**Petition Date**"); and (ii) the relief sought by the Debtors in the motions set for hearing on Friday, October 16, 2015, at 10:00 a.m. (the "**First Day Motions**"). Any capitalized term not

expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion. Any summary of the relief sought in the First Day Motions is qualified in its entirety by reference to such motions, which are incorporated herein by reference.

3. This Declaration is intended to provide a summary overview of the Debtors and these chapter 11 cases.

### I. Debtors' Businesses and Financial Information

*A. Formation and Corporate Structure*

4. CCNG's affiliates include CCNG Energy Partners GP, LLC ("**CCNG GP**"), Trinity Environmental Services, L.L.C. ("**TES**"), Trinity Environmental SWD, L.L.C. ("**TESWD**"), Moss Bluff Property, L.L.C. ("**MB**" or "**Moss Bluff**"), Trinity Environmental Titan Trucking, L.L.C. ("**Titan**"), and Trinity Environmental Services Catarina SWD, L.L.C. ("**Catarina**"). These entities, along with CCNG, are referred to collectively as the "**Debtors**." Attached as **Exhibit A** is a corporate organization chart for the Debtor entities.

5. CCNG was formed in April 2013 as a Delaware limited partnership to act as the holding Company for two wholly-owned subsidiaries, TES and MB. In May 2013, 100% of the membership interests of TES and MB were transferred to CCNG by their owners in exchange for partnership units of CCNG, under a transaction between businesses under common control. TES was originally formed in June 1999 as a Texas limited partnership and was converted to a Texas limited liability company in October 2012. MB was originally formed in March 2006 as a Texas limited partnership and was converted to a limited liability company in October 2012.

6. CCNG Energy Partners GP, L.L.C. became the General Partner of CCNG upon its creation in April 2013.

7. TESWD, a wholly-owned subsidiary of CCNG, is a Delaware limited liability company formed in April 2013 to complete the acquisition of the assets acquired in the CJ

Acquisition. Catarina and Titan are wholly-owned subsidiaries of CCNG, and both are Delaware limited liability companies formed in January 2014 to complete the acquisition certain assets located in South Texas.

B.   *The Debtors' Businesses*

8.   Taken as a whole, the Debtors earn service revenue from the disposal of non-hazardous oil and gas exploration and production waste, such as mud cuttings and other solid oilfield waste along with waste water produced during the hydraulic fracturing and production processes, in addition to truck and oilfield equipment cleaning services. The Debtors earn product sales revenue from the sale of recovered oil and brine. The Debtors provide services to oil and natural gas drilling and production companies in natural resource producing areas of Texas, New Mexico and Louisiana. The Debtors' facilities service the Eagle Ford shale region in South Texas, the Permian Basin region in West Texas and eastern New Mexico, the Haynesville shale region in East Texas and Louisiana, the Barnett shale region in Central Texas and others. The Debtors' two salt cavern facilities are located at the Moss Bluff salt dome in Liberty County, Texas and at the Palangana salt dome in Duval County, Texas (the "**Palangana Facility**"), and the Debtors' twenty-nine saltwater disposal wells and two freshwater stations located in the Permian Basin, the Barnett shale, the Eagle Ford shale, and south Texas. Additionally, the Debtors are the facility operator and owner of saltwater disposal wells, including the aboveground assets such as tanks, buildings, wash bays, and machinery. The surface and storage rights at the Palangana Facility, including the use of salt caverns, are leased by an affiliate from third parties and subleased to Debtors under a lease that is accounted for as an operating lease. Additionally, the Debtors own approximately 15 vacuum and winch trucks.

The trucks are used primarily for the hauling and disposal of flowback and produced saltwater generated by oil and natural gas exploration and development activities.

## II. Debt Structure

9. **Secured Debt**: The Debtors have pledged substantially all of their assets to Guggenheim Corporate Funding, LLC ("**Guggenheim**"), as Administrative Agent for lenders Guggenheim Private Debt Fund Note Issuer, LLC, NZC Guggenheim Fund LLC, Guggenheim Energy Opportunities Fund, L.P., Verger Capital Fund LLC, and Guggenheim Private Debt Master Fund, LLC (collectively "Guggenheim"), pursuant to:

    a.    A Credit Agreement dated October 9, 2012;

    b.    An Amended and Restated Credit Agreement dated May 17, 2013;

    c.    A Second Amended and Restated Credit Agreement dated January 31, 2014; and

    d.    A Third Amended and Restated Credit Agreement dated August 25, 2014 These agreements are referred to collectively as the "**Credit Agreement**." As of the Petition Date, the balance of the indebtedness under the Credit Agreement was approximately $177 million.

10. **Trade Debt**: As of the Petition Date, the Debtors owed approximately $7 million in accounts payable to vendors.

11. **Assets**: the Debtors assets are generally described in Section I above, and include the disposal facilities, wells, and equipment utilized in connection with the Debtors' disposal and cleaning activities and services. The Debtors believe that the assets have a value in excess of the debts owed to all creditors, including secured creditors.

## III. Background to Bankruptcy Filing

12. The Debtors have faced the same challenges as many service providers in the oil services industry due to the decline in exploration and production activities over the past year. The Debtors have reduced expenses where possible over the past few months. When the Debtors

became unable to make regular payments to under the Credit Agreement, Guggenheim refused to modify the Credit Agreement on reasonable terms. Accordingly, the Debtors were forced to seek the protection of this Court to continue operations and marshal their remaining resources for their creditors.

### IV. Summary of First Day Motions

13. The Debtors have filed a number of First Day Motions, which the Debtors believe are necessary to enable them to move forward with reorganization. The Debtors respectfully request that the relief requested in each of the First Day Motions be granted. Such relief is a critical element in the Debtors' reorganization.

14. The information contained in this section is based upon my review of the Debtors' records and operations, my discussions with the Debtors' advisors and my own knowledge of and involvement in the discussions and negotiations that led to certain of the various referenced agreements and Motions.

15. A summary description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

A. Debtor's Emergency Motion for Use of Cash Collateral [Doc. # 8] (the "**Cash Collateral Motion**")

16. In the Cash Collateral Motion, the Debtors request the entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**") authorizing the Debtors to use the cash collateral of the pre-petition secured lender, Guggenheim. The Debtors need the revenues generated from Guggenheim's collateral to pay normal and necessary operating expenses in order to preserve and protect the Debtors' businesses and the bankruptcy estates and to avoid immediate and irreparable injury.

17. The Debtors have cash on hand of approximately $2.7 million as of October 14, 2015 and are collecting additional cash arising from pre-petition receivables (altogether, the "**Cash Collateral**"). Use of Cash Collateral is necessary to fund operations and to pay the costs and expenses of administering these chapter 11 cases. Additionally, the value of the assets (and certainly of the Debtors on an enterprise basis) exceeds the debt owed to Guggenheim. The Debtors have historically funded operations between the subsidiaries through inter-company transfers, which have created due to/due from accounts. Though the cash needs depend upon collections and needed disbursements, Titan and Catarina are the main entities that have required funding. The corporate overhead of CCNG LP, of which the largest expense is payment of the Guggenheim debt, is funded by the operations of the subsidiary entities.

18. The proposed use of the Cash Collateral is specified in the initial budget ("**Budget**") attached to the Cash Collateral Motion. The Budget will be supplemented before the Final Hearing on the Cash Collateral Motion. The Debtors propose to use the Cash Collateral in accordance with the Budget up to a variance of 10% per line item, with additional expenditures requiring Guggenheim's approval. To the extent necessary to protect against any diminution in the value of Guggenheim's collateral, and as adequate protection for the Debtors' use of cash collateral, the Debtors propose to grant a post-petition lien on all collateral that was pledged to Guggenheim and was properly perfected pre-petition. The Debtors also propose that all of Guggenheim's allowable claims arising from the Debtors' use of the Cash Collateral be afforded super-priority treatment in the bankruptcies. Any post-petition liens or super-priority claims in favor of Guggenheim will be subject to a carve-out for U.S. Trustee fees.

19. Under the cash collateral order, the Debtors would be required to provide weekly accountings of their use of cash collateral to Guggenheim and to any official committee of

unsecured creditors that may be appointed. The Cash Collateral would not be used to pay pre-petition debts, professional fees, or administrative expenses without Court approval.

20. It is absolutely essential that the Debtors use a portion of the Cash Collateral in order to conduct the operations in order to preserve the value of their bankruptcy estates. The inability to make use of this Cash Collateral would cause immediate and irreparable harm. The Debtors believe that the terms proposed are reasonable in light of the limited risk Guggenheim is undertaking and in light of the need of the Debtors for the requested funding. Accordingly, the Debtors request that the Court approve this relief on an interim basis, and set a final hearing in due course as requested in the Cash Collateral Motion.

B. Emergency Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code to (i) Approve Debtors' Proposed Form of Adequate Assurance and (ii) Prohibit Utilities from Altering, Refusing, or Discontinuing Service [Doc. # 7] (the "**Utility Motion**")

21. In connection with the operation of its business and management of its properties, the Debtors obtain electricity, water, wastewater disposal, garbage disposal, telephone services, internet services, and/or other similar services (collectively the "**Utility Services**") from a number of utility companies or their brokers (collectively the "**Utility Companies**").

22. Prior to filing for bankruptcy, the Debtors were paying on average approximately $235,000.00 per month on account of Utility Services. Historically, the Debtors have had a very good payment history with the Utility Companies.

23. Uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of the Debtors' chapter 11 cases. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' efforts to reorganize. It is essential that the Utility Services continue uninterrupted during the chapter 11 cases.

24. The Debtors intend to pay timely all post-petition obligations owed to the Utility Companies. To provide adequate assurance of payment to the Utility Companies, the Debtors propose to provide, within fourteen (14) business days after entry of a Final Order approving the Utility Motion, a deposit in the aggregate of a sum equal to approximately ten (10) days of Utility Services (the "**Adequate Assurance Deposit**") into an interest-bearing, newly created and segregated account (the "**Utility Deposit Account**") for the benefit of any Utility Company unless a Utility Company agrees to a lesser amount. The Utility Deposit Account shall be held in escrow pending further order of the Court. The Debtors request the right to withdraw funds from the Utility Deposit Account to the extent such funds were deposited on account of a Utility Company that is subsequently removed from the Utility Service List. Based on the foregoing calculation, for those Utility Companies on the Utility Service List, the Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $79,000.

25. The Debtors submit that the Adequate Assurance Deposit constitutes sufficient adequate assurance to the Utility Companies. If any Utility Company believes additional adequate assurance is required, it may request such assurance pursuant to the procedures set forth in the Utility Motions.

C. Debtors' Motion to Extend Time to File Schedules and Statements of Financial Affairs [Doc. # 4].

26. Due to the number of Debtors involved, the immediate business needs of the Debtors, and the limited financial personnel available to compile the information necessary for the Schedules and Statements of Financial Affairs, the Debtors request a two-week extension, until November 9, 2015, to file their Schedules and Statements of Financial Affairs.

D. Debtors' Motions for Joint Administration of Cases [Doc. # 2 in each case].

27. Due to the interrelationships among the Debtors and the fact that all of the Debtors are either liable on or have pledged assets securing the Guggenheim debt that precipitated the bankruptcy filings, the Debtors have requested that all of the bankruptcy cases be jointly administered under *In re CCNG Energy Partners, LP*, Case No. 15-70136. Joint administration will be more efficient and benefit the Debtors' estates by avoiding the unnecessary time and expense associated with duplicate motions and hearings in each of the Debtors' cases.

### V. Conclusion

28. Based on the foregoing, I believe that the relief requested in the First Day Motions is necessary and appropriate, is in the best interests of the estate and the creditors, and should be granted in all respects."

Dated: October 15, 2015.

By: _____
Daniel Porter,
President and CEO, CCNG Energy Partners GP, LLC
General Partner of CCNG Energy Partners, LP